1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   LEO BISHOP,                                CASE NO. CV F 07-0137 LJO SMS

12                    Plaintiff,              **ORDER ON PLAINTIFF'S MOTION FOR
                                              CLASS CERTIFICATION AND JUDICIAL**
13           vs.                              **FACILITATION OF CLASS NOTICE**

14   PETRO-CHEMICAL TRANSPORT,
     LLC, et al.,
15
                     Defendants.
16   _____/

17          By notice filed on June 9, 2008, Plaintiff Leo Bishop ("plaintiff") filed a motion to certify two

18   classes in this matter.  Plaintiff also moves the Court for facilitation of notice to potential class members.

19   Defendants Petro-Chemical Transport, LLC and Kenan Advantage Group, Inc. (collectively "Petro-

20   Chemical") filed an opposition on June 23,  2008.  Defendant filed a reply on July 7, 2008.  The Court

21   thereafter took the motion under submission and vacated the hearing date.  Having considered the

22   moving, opposition, and reply papers, as well as the Court's file, the Court issues the following order.

23                    **FACTUAL AND PROCEDURAL BACKGROUND**

24          Plaintiff Leo Bishop brings this action individually and on behalf of other truck drivers who now

25   work or have worked for defendant Petro-Chemical Transport, Inc. and Kenan Advantage Group, Inc.

26   Plaintiffs allege that Petro-Chemical has a policy of requiring its truck drivers to work more than forty

27   (40) hours a week without overtime payment.  Plaintiff's Complaint contains a claim for violation of the

28   Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 210 et seq. and a claim for violation of the California

                                                    1

1   Unfair Competition law ("UCL"), Cal.Bus.&Prof.Code §17200 et seq.  This action is initially filed as

2   a potential collective action and class action.

3   　　　Petro-Chemical opposes the motion for class certification on the ground that Plaintiff and the

4   class members are exempt from the overtime provisions of the FLSA pursuant to the Motor Carrier

5   Safety Act.  29 U.S.C. §213(b)(1).

6   **A.　　Overview of Defendant Petro-Chemical's Business**

7   　　　Petro-Chemical is a nationwide trucking service which provides for-hire delivery service of

8   petroleum products, such as gasoline, diesel fuel, ethanol, and aviation fuel.  The petroleum products

9   are picked up from large loading racks and delivered to retail gasoline stations, truck stops, convenience

10  stores, commercial operations, airports and military facilities. Petro-Chemical provides these services

11  to customers like Chevron, South Coast ("7-11" stores), Petro Diamond, and TA Truck Stops, among

12  others.  (Doc. 57, Depo of Calvin Kniffin, p. 59:20.)  Petro-Chemical's trucking operations are located

13  in California, Colorado, Connecticut, Florida, Illinois, Indiana, Louisiana, Massachusetts, Maryland,

14  Missouri, New Hampshire, New Jersey, New York, Oregon, Texas Utah, Virginia, Washington and

15  Wyoming.

16  　　　Petro-Chemical claims it holds itself out as an interstate trucker.  It advertises and promotes its

17  year round ability and availability for interstate hauls.  It solicits interstate business and handles interstate

18  shipments. Petro-Chemcial presents evidence that all Petro-Chemical drivers, including those based in

19  California, are eligible to be assigned an interstate haul.  Petro-Chemical assigns loads to drivers; drivers

20  do not bid on or request loads.  Loads are assigned to drivers based on a number of factors, such as

21  which drivers are scheduled to work on any given day or night, their number of remaining "drive time"

22  hours under Federal safety regulations, route familiarity, and driver preference.  A driver with a

23  sufficient number of Federal drive hours can be assigned to any load.  Petro-Chemical does not have a

24  designated list of drivers dedicated to out of state hauls nor do the dispatchers assign out of state routes

25  to certain, select drivers.

26  **B.　　Plaintiff Leo Bishop's Driving History for Defendant**

27  　　　Plaintiff, Leo Bishop, was employed as a truck driver for Petro-Chemical from March, 2003 to

28  June, 2006, working exclusively out of Petro-Chemical's Montebello location for Chevron.  (Doc. 56.

Decl. of Bishop ¶3.)  Plaintiff states in his declaration that he regularly worked in excess of forty (40) hours per week without being paid overtime for any hours in excess of forty (40) in  a week. (Doc. 56, Decl. Of Bishop ¶3.)  Plaintiff states that his duties consisted of hauling bulk petroleum products for Petro-Chemical solely within the state of California.  (Doc. 56, Decl. Of Bishop ¶3.)

**C.      The Proposed Classes**

Plaintiff now seeks certification of two classes based on the unlawful action of failure to pay overtime. Plaintiff is a member of both proposed classes. The first class (Class 1) is an "opt-in" class and is based on willful violations of the FLSA and, thereby, incorporates the 3- year statute of limitations for such violations (see 29 U.S.C. §255(a)):

> All persons who are now employed or have been employed by defendants PETRO-CHEMICAL TRANSPORT, INC. and KENAN ADVANTAGE GROUP, INC. in the State of California who, on or after January 24, 2004 to the time of trial, have worked as a truck driver hauling bulk petroleum products.

The second class (Class 2) is an "opt-out" class based on the state law violations under the UCL and incorporates the 4-year statute of limitations for such violations (B&P Code §17208):

> All persons who are now employed or have been employed by defendants PETRO-CHEMICAL TRANSPORT, INC. and KENAN ADVANTAGE GROUP, INC. in the State of California who, on or after January 24, 2003 to the time of trial,  have worked as a truck driver hauling bulk petroleum products.

**ANALYSIS AND DISCUSSION**

**A.      Fair Labors Standards Act**

The FLSA provides that employees in interstate commerce shall be paid at one and one-half times their regular hourly rate for hours over forty in any work week. 29 U.S.C. § 207(a)(1).  Plaintiff alleges that intrastate truck drivers are entitled to overtime compensation pursuant to 29 U.S.C. §207(a), which provides:

> (1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

3

1

### 1.    Similarly Situated

To determine whether to certify the class, the main issue to be decided is whether the named plaintiffs are sufficiently "similarly situated" to the proposed opt-in plaintiffs that this case may proceed as a collective action.  The FLSA allows one or more employees to pursue an action in a representative capacity for "other employees similarly situated" and is known as a "collective action." 29 U.S.C. § 216(b); *Morisky v. Public Serv. Elect. and Gas Co.*, 111 F.Supp.2d 493 (D. N.J. 2000).

Section 216(b) of the FLSA does not define the term "similarly situated," and there is little circuit law on the subject.  The Ninth Circuit has not ruled on the issue.  As explained in the case of *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1102-03 (10th Cir.  2001), *cert. denied*, 536 U.S. 934 (2002), federal district courts have adopted or discussed at least three approaches to determining whether plaintiffs are "similarly situated" for purposes of § 216(b). *See, e.g.*, *Mooney v. Aramak*, 54 F.3d 1207 at 1213 (5th Cir. 1995) (discussing two different approaches adopted by district courts); *Bayles v. American Med. Response of Colo., Inc.*, 950 F.Supp. 1053, 1058 (D.Colo.1996). Under the first approach, a court determines, on an ad hoc case-by-case basis, whether plaintiffs are "similarly situated." *Thiessen v. GE Capital Corp*; *Mooney*, 267 F.3d at 1102-1103. In utilizing this approach, a court typically makes an initial "notice stage" determination of whether plaintiffs are "similarly situated." *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D.Colo.1997).  In doing so, a court "require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Thiessen v. GE Capital Corp*; *Mooney*, 267 F.3d at 1103 (quoting *Bayles*, 950 F.Supp. at 1066).  At the conclusion of discovery (often prompted by a motion to decertify), the court then makes a second determination, utilizing a stricter standard of "similarly situated." *See Thiessen v. GE Capital Corp*; *Mooney*, 267 F.3d at 1103.  During this "second stage" analysis, a court reviews several factors, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; (3) fairness and procedural considerations; and (4) whether plaintiffs made the filings required by the ADEA before instituting suit." *Id.*

Under the second approach, district courts have incorporated into § 216(b) the requirements of current Federal Rule of Civil Procedure 23. *See Thiessen*, 267 F.3d at 1103; *Bayles*, 950 F.Supp. at

1060-61 (discussing cases adopting this approach). In a third approach, district courts have suggested incorporating into § 216(b) the requirements of the pre-1966 version of Rule 23, which allowed for "spurious" class actions. *See Bayles*, 950 F.Supp. at 1064.

*Wynn v. National Broadcasting Co.*, 234 F.Supp. 2d 1067 (C.D. Cal. 2002) echoes this two tier analysis. *Wynn* employed the two tier approach and noted the lenient standard for ruling on class certification at the notice stage. The Eleventh Circuit endorsed this "two-tiered" approach to certification of § 216(b) opt-in classes. *See Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) (two tiered approach is an effective tool). *Accord Brown v. Money Tree Mortg., Inc.*, 222 F.R.D. 676, 680 (D.Kan. 2004) (the court will analyze plaintiff's motion under the lenient "notice stage" standard described above and, in doing so, looks to the substantial allegations in plaintiff's first amended complaint and various affidavits filed by plaintiff.); *Wren v. Rgis Inventory Specialists*, 2007 WL 4532218, 5 (N.D.Cal. 2007) (this Court concludes that the appropriate standard for resolving Plaintiffs' conditional certification motion is the more lenient standard that is applied by the majority of courts in addressing this question.) From review of many cases, this two-tier analysis is the most generally accepted. In addition, this is the analysis the Court has employed in prior similar motions.

Here, the case is somewhere between the "notice" stage and the second stage. The matter has been pending for over a year and a half. The preliminary scheduling order, setting dates for the motion for class certification, was entered on June 1, 2007. This Court's preliminary scheduling order limited the initial merits-based discovery to Mr. Bishop, and as to the issue of class certification. (Doc. 17.) The parties twice sought, and obtained, continuances of dates related to the class certification amounting to approximately six months (December 2007 to July 2008). (Doc. 17-21.) During this time, on February 8, 2008, defendant moved for summary judgment as to plaintiff's individual claims. The motion was supported by declarations, depositions and disputed facts. Many of these same facts, along with the same evidentiary support, are submitted as part of Petro-Chemical's opposition to the class certificaiton motion. This Court denied the summary judgmnet motion as it was premature on the merits of the claims. (Doc. 53.) Discovery on the merits is not complete and the case is not ready for trial. *Morisky v. Public Serv. Elect. and Gas Co.*, 111 F.Supp.2d 493 (D. N.J. 2000) (employing a stricter standard in analysis where case was beyond first stage.) Thus, the case is more at the notice stage due

5

1   to the limitation in discovery and pretrial preparation.

2          **2.       The Evidence in Support of "Similarly Situated"**

3          The allegations in the complaint state the basis for the collective action.  The detailed allegations

4   in the complaint state that plaintiffs are truck drivers and former truck drivers who worked for Defendant

5   Petro-Chemical and who have not been paid overtime compensation.  (Complaint ¶ 1.)  The complaint

6   alleges that the members were employed by defendant during the liability period as truck drivers,

7   regularly worked in excess of forty hours per week without overtime compensation and drove in

8   intrastate transportation transporting milk products from milk plants to stores or warehouses.  Thus, the

9   allegations are detailed allegations setting out the specific conduct allegedly giving rise to liability.

10  (Complaint ¶ 17, 21.)

11         Plaintiff submits his declaration in support of the motion.  Plaintiff Leo Bishop states in his

12  declaration that he is a former truck driver for defendant.  (Doc. 56, Decl. of Leo Bishop ¶2.)  Plaintiff

13  testifies that during his employment his work involved transporting bulk petroleum products solely

14  within the State of California, except for one trip to Nevada.  (Doc. 56, Decl. of Leo Bishop ¶3.)  He

15  testifies that he was not paid any overtime for the work that he performed.

16         Plaintiff presents deposition evidence, from the Director of Operations for Petro-Chemical, that

17  approximately 150 truck drivers were employed by Petro-Chemical.  (Doc. 57, Kniffen Depo., pp.

18  31:22-32:24; 40:8-11.)  Plaintiff also present evidence that in California, Petro-Chemical has contracts

19  to deliver fuel to end users, such as gasoline stations, convenient stores, airports, and other commercial

20  operations.  (Doc. 57, Kniffin Depo., pp. 58:21-59:19).

21         Plaintiff argues that he and the members of Class 1 were the victims of a systematic policy by

22  defendants Petro-Chemical to ignore the overtime requirements of the FLSA.  (Doc. 55, Plaintiff's

23  Moving Papers, p. 10.) Plaintiff argues that the allegations of systematic policy of denial of overtime is

24  sufficient to justify class certification under 29 U.S.C. §216(b).  (Doc. 55, Plaintiff's Moving Papers,

25  p. 10.) Plaintiff further argues that he and the proposed class members are similarly-situated in that they

26  (a) held the same job (truck drivers), (b) hauled similar products (bulk petroleum products), ( c) were

27  based within the State of California and (d) were not paid overtime for all hours worked in excess of

28  forty per week.  As evidentiary support for "similarly situated," plaintiff cites to his declaration.  (Doc.

6

1   55, Plaintiff's Moving Papers, p. 10; Doc. 56, Decl. of Leo Bishop ¶1-4.)

2          Plaintiff's declaration is entirely deficient in the similarity of the truck drivers.  First, the

3   declaration does not include any evidence which indicates that the other drivers who haul in California

4   were improperly paid for their work.  Leo Bishop states that he was not paid overtime, but does not offer

5   any evidence of other workers who were not paid overtime.  He does not present evidence of a company

6   wide policy to deny overtime compensation to those who are entitled to such compensation.  Further,

7   Plaintiff Leo Bishop's declaration does not state any facts as to other potential class members similarly

8   situated as him.   He does not present any evidence of other truck drivers purported goods or the routes

9   that the truck drivers drove.  While the proposed class is "truck drivers," all drivers did not drive similar

10   products or similar routes for similar customers.  The evidence before the Court is that plaintiff was

11   dedicated driver to Chevron, a Petro-Chemical customer, at the Montebello facility.   There is no

12   evidence before the Court that any other driver is similarly dedicated. Thus, the declaration does not

13   support the similarity of the products or routes performed by the similar truck drivers.

14          The other evidence cited by plaintiff is to the deposition testimony of Cal Kniffin.  (See Doc.57,

15   Kniffin Depo., pp. 58:21-59:19) The deposition of Kniffin, however, does not support the failure to pay

16   overtime, the similarity of routes, similarity of the drivers, or other facts.  The cited deposition excerpt

17   identifies that Petro-Chemical has contracts to deliver petroleum products to end users - customers such

18   as gasoline stations, military facilities, commercial operations.  (See Doc.57, Kniffin Depo., pp.

19   58:21-59:19).  While the standard for conditional approval at the stage of the litigation is lenient, it does

20   require some evidentiary support.  The lack of any evidence of similarity or even other potential class

21   members precludes class certification.  *See e.g., Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d at 1219

22   ("[P]laintiffs bear the burden of demonstrating a reasonable basis for their claim of classwide

23   discrimination. The plaintiffs may meet this burden, which is not heavy, by making substantial

24   allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which

25   successfully engage defendants' affidavits to the contrary); *Trinh v. JP Morgan Chase & Co.*, 2008 WL

26   1860161, 3 (S.D.Cal. 2008) (In support of their conditional certification request, Plaintiffs simply state

27   that Plaintiffs and members of the putative class had essentially the same job description and training

28   and were compensated in the same manner.); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir.

7

1996), *cert. denied, Helton v. Kmart*, 519 U.S. 982 (1996) ("[P]laintiffs may meet this burden, which is not heavy, by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary."); *Tucker v. Labor Leasing, Inc.*, 872 F.Supp. 941, 948 (M.D.Fla.1994) (finding that the plaintiffs had failed to show that employees working at truck terminals other than the terminal where the named plaintiffs worked were similarly situated to the named plaintiffs). Plaintiff has failed to carry his burden that other drivers are similarly situated.

**B.      Motor Carrier Safety Exemption Defense**

       **1.      Requirements**

Assuming plaintiff had met his evidentiary burden, the Court next determines whether the class could be certified in light of Petro-Chemical's defense of the Motor Carrier Safety Exemption Defense.

The FLSA provides many exceptions, one of which is the Motor Carrier Safety exemption, 29 U.S.C. §213(b)(1), which provides that the provisions of 29 U.S.C. §207 shall not apply to:

> (1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49.

Section 31502 of Title 49, in turn, authorizes the Secretary of Transportation, in the interest of safety, to establish "qualifications and maximum hours of service for employees" of motor carriers:

> The Secretary of Transportation may prescribe requirements for--
>
> (1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and
>
> (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation.

The FLSA provides for overtime pay for employees generally.  Section 213(b)(1) provides, however, that employees whose qualifications and maximum hours of driving are subject to regulation by the Secretary of Transportation under the Motor Carrier Safety Act are exempt from the overtime provisions of §207(a).   The Secretary of Transportation has power to regulate transportation

> 1) between a place in--
>
> (A) a State and a place in another State;

1          (B) a State and another place in the same State through another State;

2

3    Thus, interstate commerce falls within the jurisdiction of the Secretary of Transportation and is exempt

4    from coverage under FLSA.   Moreover, the Secretary of Transportation has jurisdiction to regulate

5    intrastate commerce that "is a practical continuity of movement from the manufacturers or suppliers

6    without the state, through a warehouse and on to customers." *Klitzke v. Steiner,* 110 F.3d 1465, 1469

7    (9th Cir. 1997) (involving local delivery driver for linen service that ordered roughly half of the materials

8    it supplied from out-of-state suppliers, based on specific customers' orders); *but see Packard v.*

9    *Pittsburgh Transp. Co.*, 418 F.3d 246, 255 (3rd Cir. 2005), *cert. denied,* 547 U.S. 1093 (2006) (the

10   "essential character" of truly interstate transport will show some "essential continuity of movement.").

11   Whether such intrastate commerce is exempt is determined on an ad hoc basis:

12                "Whether transportation is interstate or intrastate is determined by the
              essential character of the commerce, manifested by shipper's fixed and
13            persisting transportation intent at the time of the shipment, and is
              ascertained from all of the facts and circumstances surrounding the
14            transportation." *Klitzke,* 110 F.3d at 1469.

15   Thus, the Motor Carrier exemption defense can be established by (1) showing that a driver can

16   reasonably be expected to drive across state lines, or (2) drivers hauled goods in "the practical continuity

17   of movement" in interstate commerce. *Watkins v. Ameripride Serv.*, 375 F.3d 821, 825-26 (9th Cir.

18   2004).  A driver is considered to be driving in interstate commerce if the driver is called upon to drive

19   in interstate commerce as part of the driver's regular employment, or, even if the driver has not

20   personally driven in interstate commerce, if, because of company policy and activity, the driver could

21   reasonably be expected to drive in interstate commerce. As such, if a carrier does interstate work and

22   assigns drivers randomly to that driving, all of its drivers are considered subject to the Motor Carrier

23   Safety Act. *Dole v. Circle "A" Construction, Inc.*, 738 F.Supp. 1313, 1322 (D. Idaho 1990) (To prove

24   the defense (1) Circle A engaged in interstate commerce; and (2) that all of its drivers could reasonably

25   have been expected to make interstate runs. ) However, a driver is not subject to the Motor Carrier Safety

26   Act if there is no possibility of driving interstate or the possibility is remote. (Ibid.)  *See also Kosin v.*

27   *Fredjo's Enterprises, Ltd.*, 1989 WL 13175 (N.D. Ill. 1989) (Factors to consider, in determining whether

28   the motor carrier exemption applies to an entire class of employees when only a few are involved "in

                                                          9

1   interstate commerce," are: (1) the proportion of interstate to intrastate employee activity; (2) the method

2   by which a carrier assigns the interstate activity to its employees; and (3) the overall nature of the

3   carrier's business).

4           **2.      Burden of proof of the exemption**

5           To ensure employee's maximum coverage under the FLSA, exemptions under Section 213 are

6   construed narrowly against the employer asserting their applicability, and the employer carries the

7   burden of proving that an exemption applies. *See, e.g., Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S.

8   190, 206, 86 S.Ct. 737, 747, 15 L.Ed.2d 694 (1966).  The Ninth Circuit Court has recognized that,

9   "[e]mployers who claim an exemption applies to their employees must show that the employees fit

10  plainly and unmistakably within its terms." *Worthington v. Icicle Seafoods, Inc.*, 774 F.2d 349, 352 (9th

11  Cir.1984), *cert. granted in part*, 474 U.S. 900, 106 S.Ct. 270, 88 L.Ed.2d 224 (1985), *and judgment*

12  *vacated on other grounds*, 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986).

13          Defendant argues that the class at issue in the instant motion is improper because an intensive

14  individualized inquiry will have to be performed to determine whether each potential member has driven

15  outside California.  Defendant argues that the Motor Carrier exemption applies because (1) drivers

16  actually made interstate hauls, (2) the drivers could reasonably be expected to make interstate hauls, and

17  (3) the drivers hauled goods "in the stream of interstate commerce."

18          **A.      Drivers actually made interstate hauls**

19          It is the nature of both the employer's and the employee's activities that is determinative of this

20  exemption.

21              "The exemption of an employee from the hours provisions of the Fair
               Labor Standards Act under section 13(b)(1) depends *both* on the class to
22             which his employer belongs and on the class of work involved in the
               employee's job. The power of the Secretary of Transportation to establish
23             maximum hours and qualifications of service of employees, on which
               exemption depends, extends to those classes of employees and those only
24             who: . . . (2) engage in activities of a character *directly affecting the*
               *safety of operation of motor vehicles in the transportation on the public*
25             *highways* of passengers or property in interstate or foreign commerce
               within the meaning of the Motor Carrier Act."

26

27  29 C.F.R. § 782.2(a) (emphasis added).

28  /////

                                                    10

1    To determine whether an employee falls within an exempt category, "what is controlling is the

2  character of the activities involved in the performance of his job." 29 C.F.R. § 782.2(b)(2).  In *Morris*

3  *v. McComb*, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947), the Supreme Court held the Motor Carrier

4  exemption applicable to all drivers and mechanics of a small common carrier, even though the interstate

5  carrier services rendered by the company constituted less than 4% of its total carrier services.  Those

6  interstate trips were found not to have been distributed equally among the company's drivers.  Despite

7  the small number of interstate hauls actually made and the unequal distribution among the firm's drivers

8  of such hauls, the Court nevertheless found that the performance of such work, within the Motor Carrier

9  exemption.  The interstate work was "shared indiscriminately by the drivers and was mingled with the

10  performance of other like driving services rendered by them otherwise than in interstate commerce." 332

11  U.S. at 433, 68 S.Ct. at 136. The Court in *Morris* based its decision on the fact that those interstate

12  routes which were serviced were assigned indiscriminately among all the drivers, so that all of the

13  carrier's drivers were eligible to receive an interstate route at some point throughout a year.  *Id.* at 433,

14  68 S.Ct. at 136.

15    Petro-Chemical presents evidence that its drivers made actual interstate hauls of petroleum

16  products.  For instance, plaintiff acknowledges that he made one interstate haul to Nevada during his

17  employment with Petro-Chemical.  (Doc. 60, Exh. B, Bishop Depo., 77-14-79:7.)  Defendant presents

18  further evidence that other drivers made interstate hauls during the relevant period.

19    -    In 2006, at least 17 different Petro-Chemical drivers hauled product from California to

20      other stated, including Nevada, Arizona and Texas.

21    -    in 2005, at least 44 different Petro-Chemical drivers hauled product from California to

22      other states, including Nevada, Arizona, Colorado and Texas.

23    -    In 2004, at least 14 different Petro-Chemical drivers hauled product from Califonria to

24      other states, including Nevada, Colorado and Utah.

25    -    In 2003, at least 5 different drivers hauled product from California to Nevada.

26  (Blinn Decl., ¶3, Exh. A; Doc. 59, Defendant's Opposition, p.9 and the evidence cited therein.)

27  Defendant submits the declarations of 12 truck drivers who each state that they have made interstate

28  trips. (See  Doc. 59, Defendant's Opposition, p.9 and the evidence cited therein.)

1    Some of the potential class members actually made interstate hauls.  The evidence presented

2    demonstrates that Petro-Chemical employed approximately 150 drivers.  Presumably, 150 were

3    employed in each of the four applicable years. The evidence presented demonstrates numerous different

4    drivers drove across state lines. Thus, there is evidence of actual interstate travel of the same drivers for

5    whom plaintiff seeks class certification.[1]

6    The courts do not require significant activity to meet the interstate commerce requirement.  In

7    *Chao v. First Class Coach Company*, the court held that where 5-10% of the ride tickets for a bus

8    service were purchased out of state by visitors to the state, the bus service was exempt from the FLSA

9    due to the motor carrier exemption. *Chao v. First Class Coach Company, Inc.*, 214 F.Supp.2d 1263,

10   1263 (M.D.Fla.2001).  In *Burris v. Bozzay Roadrunner Service, Inc.*, 651 F.Supp. 36, 38 (E.D.Mo.

11   1986), the employer presented evidence that 6.6% of the total hauling jobs undertaken required the

12   carrier to cross state lines, and that 90.3% of the delivery runs during the period involved goods traveling

13   in interstate commerce.  The Court found that this evidence showed "interstate commerce" and granted

14   the employer summary judgment on its defense of the Motor Carrier exemption.  *Burris*, 651 F.Supp.

15   at 38.

16   Thus, there is evidence before the Court of potential class members actually driving across state

17   lines.[2]

18   **B.    Employees' Reasonable Expectation of Driving interstate**

19   Petro-Chemical argues that its truckers had reasonable expectations of driving in interstate

20   commerce. As such, the drivers are exempt from overtime compensation.

21   As noted in *Elliot v. Dave Ernstes & Sons Trucking*, 2006 WL 2849705, *6 (S.D.Ind. 2006),

---

[1] There is no evidence as to the percentage of interstate travel, including in the practical continuity of commerce, in relation to intrastate travel.  Significantly, the evidence demonstrates that a number of different drivers, for the proposed class, actually drove across state lines.

[2] The Court has addressed class certification in trucker overtime cases in multiple related cases.  The related cases include *Willis v. Cal-Western Transport,* CV-00-5695, *Baganha v. Cal. Milk Transport*, CV-01-5729, *Vasquez v. Jim Aartman, Inc.*, CV-02-5624, *Aguayo v. Oldenkamp*, CV-04-6279 and *Rees v. Souza's Milk Transportation*, CV-05-0297, among others.  Plaintiff relies on these cases as a basis for class certification in the instant case.  The evidence presented by the defendants in those related cases is entirely different than the evidence presented by Petro-Chemical.  Defendant accurately distinguishes evidence, and notes the evidentiary deficiencies, in the related trucker overtime cases. See Doc. 59, Defendant's Opposition to Motion, p.10 n.7.  The Court, herein, considers the evidence presented by Petro-Chemical independently from the related cases.

"The 'indiscriminate assignment' formulation from *Morris* is just a shorthand way to get at the real issue--whether Plaintiffs could reasonably be expected to travel interstate as part of their duties."  In determining whether the drivers had reasonable expectations of interstate driving, courts look at whether the carrier conducted interstate work or whether the carrier actively attempted to obtain interstate work during the period in question.  (See *Morris v. McComb*, 332 U.S. at 433.)

Likewise, in *Starrett v. Bruce*, 391 F.2d 320, 322 -323 (10th Cir.), *cert. denied,* 393 U.S. 971 (1968), a truck driver brought an action to recover overtime compensation under the FLSA.  While the owner derived no income from transportation of goods in interstate commerce, he held himself out to the general public as being available for interstate hauls and actively solicited interstate business. The truck driver argued that the trucking company did not actually perform any interstate transportation.  Nonetheless, the court found that the lack of actual interstate transportation did not dispose of the case.  The court held that, "It is however the character of the employee's activities rather than the proportion of either his time or his activities that determines the actual need for the Commission's power to establish qualifications and maximum hours of service" citing *Morris v. McComb. Starrett v. Bruce*, 391 F.2d 322 -323 (emphasis added).  Significantly, the court noted that even though no interstate activities were obtained, "[a]ll of appellee's truck drivers were assigned work indiscriminately and all would have actually driven in interstate commerce if such hauls had been obtained by appellee. Even those drivers such as appellant who had never handled an interstate shipment were subject to be assigned an interstate trip."  *Id.* at 323;  *Accord Brennan v. Schwerman Trucking Co. of Virginia, Inc.*, 540 F.2d 1200, 1204 (4th Cir. 1976) ("Schwerman at all times relevant hereto held itself out as available for interstate cartage, solicited interstate business and handled any interstate shipments received. . . As such, Schwerman falls squarely within the definition of a common carrier and is subject to regulation by the Secretary of Transportation").

For the reasonable expectation test to apply, "a carrier's involvement in interstate commerce must be established by some concrete evidence such as an actual trip in interstate commerce or proof that interstate business was solicited," and the carrier must be shown to "have engaged in interstate commerce within a reasonable period of time prior to the time at which jurisdiction is in question." *Reich v. American Driver Service, Inc.*, 33 F.3d 1153, 1156 (9th Cir. 1994) ("if jurisdiction is claimed over a

driver who has not driven in interstate commerce, evidence must be presented that the carrier has engaged in interstate commerce and that the driver could reasonably have been expected to make one of the carrier's interstate runs.").  For instance, in *McGee v. Corporate Express*, 2003 WL 22757757 (N. D.Ill. 2003), the court noted that the exemption "does not apply 'if there is no possibility of the individual driver doing interstate driving or if the possibility of interstate driving is remote." Id. at *6.  The defendant in McGee contended that its supervisors randomly assigned interstate deliveries; however, the plaintiffs presented evidence that drivers were assigned to work routes on a permanent (or at least quasi-permanent) basis and that routes were reassigned only when someone did not come into work. Id. at *7; See *Mason v. Quality Transport Services, Inc.*, 2005 WL 5395338, *3 (S.D.Fla.,2005) (no reasonable expectation of traveling interstate. Mason testified that when the subject of driving other routes besides a local route came up during his employment interview, he indicated that he did not want to drive such routes and could not drive interstate for "professional" reasons, and that his employer indicated he would be assigned a local route permanently. )

Petro-Chemical presents evidence that its drivers can be asked, and are asked, to make interstate hauls.  Each of the driver declarations states, in sum and substance, that they were told that they may be asked to drive out of state and that each has an expectation that "I may be asked to haul petroleum products across California State lines at any given time, on any given shift."  (See e.g., Tom Anderson Decl.¶3; Frank Arias Decl. ¶3, Al Waller Decl. ¶3.)  Petro Chemical also presents evidence that during the hiring process, hirees are informed that Petro-Chemical is a "for hire" carrier and that drivers could be asked to asked to haul loads from California to Arizona, Nevada or other states.  (Doc. 63, Decl. Randy Brown ¶2.)

Petro-Chemical further presents evidence that it actively pursues and obtains interstate transportation of petroleum products.  Petro-Chemical's Director of Operations, Calvin Kniffin, states that as a service business, Petro-Chemical promotes its ability and availability to make interstate hauls:

> "PCT represented and promoted its year round ability and availability for interstate hauls to existing and prospective customers, solicited interstate hauls from existing and prospective customers by telling them that we can handle that work, and has handled interstate hauls for customers, along with intra-state hauls." (Doc. 33, Kniffin dec. ¶3.)

1   Petro-Chemical has written promotional materials to explain its business.  The promotional materials

2   state that Petro-Chemical handles "customer locations throughout the country" and that its fleet is

3   "nationwide." (Doc. 33, Kniffin Decl, Exh. A p. 13.)  Due to Petro-Chemical's interstate operations, its

4   drivers comply with the Department of Transportation regulations and its trucks are registered with

5   DOT.  (Doc.33, Kniffin Decl. ¶3.)  In its promotional materials, Petro-Chemical touts its drivers'

6   training in the Federal Motor Carrier Safety Regulations.  (Doc. 33, Kniffin Decl. Exh. A, p. 21.)

7        The only evidence before the Court is that drivers have a reasonable expectation of making

8   interstate hauls.

9                 **C.  The drivers hauled goods "in the stream of interstate commerce"**

10       Defendant argues that drivers who do not cross state lines, and claim not to have reasonably

11  expected to cross state lines, are still exempt if they haul products that are involved in the "practical

12  continuity of movement" in the stream of interstate commerce.  Petro-Chemical argues that at least one

13  petroleum product it hauls - ethanol - is shipped through interstate commerce.

14       Employers who transport solely within a single state are subject to the Secretary's jurisdiction

15  where the transportation is part of a "practical continuity of movement" across state lines. *Walling v.*

16  *Jacksonville Paper Co.*, 317 U.S. 564, 568 (1964).  Once the goods enter into "the channels of interstate

17  commerce," a halt in the movement of the goods does not necessarily mean that they are no longer in

18  interstate commerce.  *Walling*, 317 U.S. at 568.  Instead, if the stop represents "a convenient

19  intermediate step in the process of getting them to their final destinations, [the goods] remain 'in

20  commerce' until they reach those points." *Id.*  The intrastate movement may be part of the "practical

21  continuity of movement" where the "contract or understanding pursuant to which goods are ordered, like

22  a special order, indicates where it was intended that the interstate movement should terminate." *Id.* at

23  569.  The Ninth Circuit has ruled that intrastate deliveries may be considered in the stream of interstate

24  commerce if the property in question originated from out-of-state, and the intrastate portion of the route

25  is merely part of the final phase of the unmistakably interstate transport. *Klitzke v. Steiner Corp.*, 110

26  F.3d 1465, 1469-70 (9th Cir.1997).

27       Defendant presents evidence that it hauls ethanol for Chevron.  Chevron purchases ethanol

28  produced in the Midwest.  The ethanol is shipped via railcar to California from the Midwest, unloaded

into temporary storage tanks at the shipyard, then picked up by Petro-Chemical drivers for the final leg of the trip to Chevron's loading racks where the loads are unloaded into temporary storage tanks.  (Doc. 64, Decl. Ron Ritchie ¶2-3.)  Petro-Chemical estimates that its truckers transport about 20 loads of ethanol every day. (Doc. 64, Decl. Ron Ritchie ¶2-3.)  Chevron then adds the ethanol to refined grades of gasoline.[3]  (Doc. 64, Decl. Ron Ritchie ¶4.)  After a Petro-Chemical driver unloads the ethanol to the Chevron storage loading racks, the driver may turn around and reload his truck with refined gasoline which is delivered to retail filling stations.  (Doc. 64, Decl. Ron Ritchie ¶4.)  From the evidence presented it appears that the ethanol is transported interstate.

Petro-Chemical also hauls various other products such as gasoline, diesel, jet fuel, transmix, aviation gas.  (Doc. 59, Opposition papers, p. 14-15 and the evidence cited therein.)  Petro-Chemical does not explain or provide any evidence of how these products are in interstate commerce.

Here, the Court does not decide whether the exemption to the FLSA applies based solely upon transportation of ethanol in the stream of commerce.  Plaintiff has failed to carry his burden that the proposed class members are similarly situated and defendant has presented sufficient evidence to demonstrate that an individualized inquiry would have to be made on the Motor Carrier exemption.

### 3.   Cases Relied on by Plaintiff in his Reply Brief

Plaintiff argues that the Court cannot consider the merits of the action in determining whether certification is appropriate.  Plaintiff argues that considering the Motor Carrier exemption is an unauthorized evaluation of the merits of the case.

Plaintiff relies upon *Mowdy v. Beneto Bulk Transp.*, 2008 WL 901546, 3 (N.D.Cal.) (N.D.Cal. 2008) for the proposition that conditional certification should not include an assessment of the merits and/or the necessity for an individualized inquiry, which is was better left to the second-stage.  In *Mowdy*, like in the instant case, plaintiff truck drivers brought a motion for conditional class certification.  Plaintiffs argued that other drivers of defendants are or were subject to substantially similar

---

[3] The evidence presented by Petro-Checmial is that its drivers do not refine or modify the product at any time during the transportation; the ethanol is blended into gasoline after it is delivered by its drivers. The  "practical continuity of interstate commerce" can be broken by processing of the product.  *Kimball v. Goodyear Tire and Rubber Co.*, 504 F.Supp 544 (E.D.Tex 1980) held there was an interruption in the "practical continuity" when a product clearly came to rest instate and was refined and changed by chemical processing.

job requirements and pay provisions, and that the policy or practice of defendants was to not pay overtime wages. Like defendants here, defendants in *Mowdy* argued that the drivers were exempt from overtime wages due to the Motor Carrier Exemption. Like plaintiff here, plaintiffs in *Mowdy*, argued that the court should not consider defendants' exemption argument because that would require the court to decide issues on the merits. The court ultimately conditionally certified the class.

The evidence presented to the *Mowdy* court, however, was entirely different. First, the plaintiff presented comprehensive evidence of their activities. Plaintiffs presented evidence of their routes, products hauled, and hours worked. Plaintiffs presented evidence that they never drove a load out of state while employed. Significantly, plaintiffs in *Mowdy* presented other evidence from drivers that they similarly claimed to never have driven out of state. Plaintiffs further presented evidence that they claimed to forego other work and only sought jobs with defendant because they were promised only local work.

Here, plaintiff Bishop has not presented any such evidence of similarity. As discussed above, the Court does not find the evidence sufficient to carry even the lenient burden at this first stage. *Coopers & Lybrand v. Livesay*, 437 US 463, 469, 98 S.Ct. 2454, 2458 (1978) (class certification may require courts to answer questions "enmeshed in the factual and legal issues comprising the plaintiff's cause of action").

Further, in *Mowdy*, the Court did indeed evaluate the merits of the Motor Carrier exemption, but found that the defendants' evidence insufficient. First, the Court found that the defendant had not presented sufficient evidence whether its drivers all actually drive or have a reasonable expectation that they will be asked to drive out of state. While defendant presented evidence that customer demand may require out of state travel, defendant admitted that they accommodate drivers' requests for local routes. Plaintiffs and other drivers had presented evidence that they only drove local routes. The Court therefore found "defendants' arguments as to out-of-state driving and reasonable expectations do not sufficiently negate petitioners' claims at this stage of conditional certification." *Id.* At *5. In addition, defendant failed to present enough evidence about the products it hauled: "the court does not have enough information from defendants about the products defendants' drivers haul to know whether all drivers are exempt from the FLSA. It is unclear at this point which drivers haul which types of products at what

17

1    times." *Mowdy*, 2008 WL 901546, *5.

2        Thus, contrary to plaintiff's argument, *Mowdy* considered the merits of the Motor Carrier

3    exemption defense in determining whether to conditionally certify the class.  The Court conditionally

4    certified the class because the plaintiffs carried their burden of proof and defendants' evidence was

5    insufficient as to the Motor Carrier exemption.

6        In his reply brief, plaintiff also relies upon *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156,

7    177-178, 94 S.Ct. 2140, 2152 - 2153 (1974) for the proposition that the Court cannot engage in a merit

8    based evaluation of the case at the class certification stage.  In *Eisen,* the district court held a preliminary

9    hearing at which it determined that the plaintiffs were very likely to prevail on the merits.  The District

10   court interpreted Rule 23 to authorize such a hearing as part of the determination whether a suit may be

11   maintained as a class action. The Supreme Court reversed on the grounds that such a preliminary hearing

12   is not provided for under Rule 23:

13            "We find nothing in either the language or history of Rule 23 that gives
              a court any authority to conduct a preliminary inquiry into the merits of
14            a suit in order to determine whether it may be maintained as a class
              action. Indeed, such a procedure contravenes the Rule by allowing a
15            representative plaintiff to secure the benefits of a class action without first
              satisfying the requirements for it. He is thereby allowed to obtain a
16            determination on the merits of the claims advanced on behalf of the class
              without any assurance that a class action may be maintained."
17
     In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have
18
     stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are
19
     met. *Id.* at 427.
20
         *Eisen* is distinguishable because the trial court considered the merits of the case without first
21
     requiring the plaintiff to meet its burden on class certification.  Here, this Court has found that plaintiff
22
     Bishop has failed to satisfy his burden on class certification that the class members are similarly situated.
23
     In addition, the Court has evaluated the evidence of the Motor Carrier exemption, not to determine
24
     whether plaintiff will ultimately prevail at trial, but to determine, again, whether the proposed class
25
     members are similarly situated.  Notably, the Ninth Circuit acknowledges that a consideration of the
26
     merits evidence may be necessary in class actions: "Of course, we recognize that courts are not only 'at
27
     liberty to' but must consider evidence which goes to the requirements of Rule 23 [at the class
28

                                                18

1  certification stage] even [if] the evidence may also relate to the underlying merits of the case." *Dukes*

2  *v. Wal-Mart, Inc.*, 509 F.3d 1168, 1178 (9th Cir. 2007).  Therefore, any consideration of "merits"

3  evidence goes only to the issue of whether the class should be certified, and not whether plaintiff will

4  prevail at trial.

5  **C.    State Law Claim**

6        **1.    Requirements of Rule 23**

7        Plaintiff also alleges that the failure to pay overtime compensation as required by 29 U.S.C. §207

8  (a) is a violation of the California Competition Law ("UCL").  UCL prohibits entities from engaging in

9  unfair competition, including unlawful, unfair or fraudulent business practices.  A class action for this

10  violation must satisfy Fed.R.Civ.P.23.

11        All class actions under Rule 23 must meet four prerequisites:

12              1.    Numerosity,

13              2.    Commonality,

14              3.    Typicality,

15              4.    Adequacy of representation.

16  The burden on the motion is on the party seeking to maintain the class action.  In this case, plaintiff must

17  establish a prima facie showing of each of the elements of Rule 23 (a) prerequisites and the appropriate

18  23(b) ground for a class action.  *Taylor v. Safeway Stores, Inc.* 524 F.2d 263, 270 (10th Cir. 1975),

19  *overruled on other grounds by Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983).  Plaintiffs need only

20  present sufficient proof to allow the court to come to a "reasonable judgment" on each requirement.

21  *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976).

22  The Court must also find that at least one of the following three conditions of Rule 23(b) are satisfied:

23      (1) the prosecution of separate actions would create a risk of:

24          (a) inconsistent or varying adjudications or (b) individual adjudications

25          dispositive of the interests of other members not a party to those adjudications;

26          (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or

27

28          (3) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other

1    available methods for the fair and efficient adjudication of the controversy.

2    See Fed.R.Civ.P. 23(b).

3    Before certifying a class, the Court must conduct a "rigorous analysis" to ensure that the four

4    requirements of Rule 23(a) are met and that the class fits within one of the three categories of Rule 23(b).

5    *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364 (1982). Plaintiff can meet this

6    burden by "providing the Court with a sufficient basis for forming a 'reasonable judgment' on each

7    requirement." *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir.1975), *cert. denied*, 429 U.S. 816 (1976).

8    The movant's burden is to produce evidence by affidavits, documents or testimony establishing each

9    Rule 23 requirement. A class action "may only be certified if the trial court is satisfied, after a rigorous

10   analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Tel. Co. of Southwest v.*

11   *Falcon*, 457 US 147, 161, 102 S.Ct. 2364, 2372  (1982); *see In re Initial Public Offering Secur. Litig.*,

12   471 F.3d 24, 33 (2nd Cir. 2006) (Rule 23 requirements must be met, not just supported by "some

13   evidence.")

14   **B.    Application of Rule 23 Requirements to the Facts of the Case**

15         **1.    Numerosity**

16   The class must be so numerous that joinder of all members individually is "impracticable."

17   Fed.R.Civ.P. 23(a)(1).  No specific numerical threshold is required; each case must be examined.

18   *General Tel.C. v. E.E.O.C.*, 446 U.S. 318, 330, 100 S.Ct. 1698 (1980).  Generally, 40 or more members

19   will satisfy the numerosity requirement.  *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473,

20   483 (2nd Cir. 1995), *cert. denied*, 515 U.S. 1122 (1995).

21   Here, it is uncontested that should the Court approve a potential class, the only evidence of the

22   number of class members demonstrates that the class would consist of 150 truckers.  Thus, this number

23   of potential class members satisfies the numerosity requirement.

24         **2.    Commonality**

25   There must be questions of law or fact common to the class.  Fed.R.Civ.P. 23(a)(2).  A "common

26   nucleus of operative facts" is usually enough to satisfy the commonality requirement.  *Rosario v.*

27   *Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992), *cert. denied*, 506 U.S. 1051 (1993).  Commonality

28   focuses on the relationship of common facts and legal issues among class members. *Dukes v. Wal-Mart,*

20

1    *Inc.*, 509 F.3d 1168, 1177 (9th Cir. 2007). "[P]laintiffs may demonstrate commonality by showing that

2    class members have shared legal issues by divergent facts or that they share a common core of facts but

3    base their claims for relief on different legal theories." *Dukes v. Wal-Mart,* 509 F.3d at 1177.

4          In *Dukes*, the proposed class encompassed approximately 1.5 million employees, both salaried

5    and hourly, with a range of positions, who are or were employed at one or more of Wal-Mart's 3,400

6    stores across the country. *Id.* at 1177.   Plaintiffs argued in *Dukes* that the large class is united by a

7    complex array of company-wide discriminatory practices against women.   In *Dukes*, the District Court

8    certified a class of workers and the Ninth Circuit affirmed the certification.   The Ninth Circuit held that

9    plaintiff presented commonality of facts or law.   Plaintiffs presented four categories of evidence: (1)

10    facts supporting the existence of company-wide policies and practices; (2) expert opinions supporting

11    the existence of company-wide policies and practices; (3) expert statistical evidence of class-wide gender

12    disparities attributable to discrimination; and (4) anecdotal evidence from class members around the

13    country of discriminatory attitudes held or tolerated by management.   *Dukes v. Wal-Mart*, 509 F.3d at

14    1178.   After reviewing the totality of the plaintiffs' evidence, the Court held that: "Plaintiffs' factual

15    evidence, expert opinions, statistical evidence, and anecdotal evidence demonstrate that Wal-Mart's

16    female employees nationwide were subjected to a single set of corporate policies (not merely a number

17    of independent discriminatory acts) that may have worked to unlawfully discriminate against them in

18    violation of Title VII." *Id.* at 1183.

19          Plaintiff argues defendant has a class wide policy of failure to pay overtime wages.   The sole

20    support for this argument is plaintiff's declaration that he was not paid overtime compensation.   There

21    is no evidence before the Court that there is a company wide policy to deny, <u>improperly</u>, overtime to

22    those who are entitled to overtime compensation.   The evidence does not suggest anything other than

23    an isolated instance as to plaintiff.   Unlike the evidence in *Dukes,* there is no strong evidence of company

24    wide policies and corporate structure. Therefore The Court does not find commonality of facts or the law

25    as between plaintiff and potential class members.

26        **3.**    **Typicality**

27          Although the commonality and typicality requirements of Rule 23(a) tend to merge, each factor

28    serves a discrete purpose. Commonality examines the relationship of facts and legal issues common to

1   class members, while typicality focuses on the relationship of facts and issues between the class and its

2   representatives. *Dukes v. Wal-Mart*, 509 F.3d at 1184, citing 1 Newberg on Class Actions, § 3:13 at 317.

3   Rule 23(a)(3) requires that "the claims or defenses of the representative parties be typical of the claims

4   or defenses of the class.""[U]nder the rule's permissive standards, representative claims are 'typical' if

5   they are reasonably coextensive with those of absent class members; they need not be substantially

6   identical." *Dukes v. Wal-Mart*, 509 F.3d at 1184.  In *Dukes*, the court found that the representative's

7   claims were typical, despite the differences in alleged employment practices:

8              Even though individual employees in different stores with different
               managers may have received different levels of pay or may have been
9              denied promotion or promoted at different rates, because the
               discrimination they allegedly suffered occurred through an alleged
10             common practice-e.g., excessively subjective decision-making in a
               corporate culture of uniformity and gender stereotyping-their claims are
11             sufficiently typical to satisfy Rule 23(a)(3).

12

13          Here, the representative's claims **may be** typical of **some** of the proposed class members but

14   **a**typical of other of the proposed class members.

15          In *Dukes*, the court found the representative's claims typical of the class based on what was

16   claimed as the alleged violation.   "[B]ecause all female employees faced the same alleged

17   discrimination, the lack of a class representative for each management category does not undermine

18   Plaintiffs' certification goal."  *Dukes v. Wal-Mart,* 509 F.3d at 1184.  Thus, typicality is determined by

19   the violation alleged to have occurred.

20          Here, the alleged violation was wage and hour violations.  As stated above, there is insufficient

21   evidence as to whether or not the violations occurred.  Further, plaintiff was dedicated to the Chevron

22   facility.  There is no evidence that other class members were similarly dedicated to any facility. The

23   representative's claims are not typical of the class members, because violations did not occur as to some

24   class members.

25          **d.      Adequacy of Representation**

26          The person representing the class must be able "fairly and adequately to protect the interests" of

27   all members in the class. Fed.R.Civ.P. 23(a)(4). The representation is "adequate" if the attorney

28   representing the class is qualified and competent and the class representatives are not disqualified by

1  interests antagonistic to the remainder of the class. *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d

2  597, 512 (9th Cir.1978).

3      Plaintiff argues he will fairly and adequately represent the class.  He also argues that neither

4  plaintiff nor counsel have a conflict with any putative class member.  Plaintiff is willing to vigorously

5  prosecute the action.  Counsel are experienced class action and employment lawyers.  A determination

6  on adequacy of representation is not necessary given the Court's finding that Plaintiff cannot satisfy

7  commonality and typicality under 23(a).

8  **C.      Rule 23(B) requirements**

9      As noted above, if plaintiffs satisfy their burden under Rule 23(a), the Court must also find that

10  at least one of the following three conditions of Rule 23(b) is satisfied:

11   (1) the prosecution of separate actions would create a risk of:
         (a) inconsistent or varying adjudications or (b) individual adjudications
12         dispositive of the interests of other members not a party to those
           adjudications;

13
     (2) the party opposing the class has acted or refused to act on grounds generally
14       applicable to the class; or

15   (3) the questions of law or fact common to the members of the class predominate over
         any questions affecting only individual members, and a class action is superior to other
16       available methods for the fair and efficient adjudication of the controversy.

17  Plaintiffs propose certification under both Rule 23(b)(2) and 23(b)(3).

18      Here, the 23(b)requirements are evaluated when all requirements under 23(a) have been met.

19  Since the Court found that plaintiffs have not carried their burden of meeting the 23(a) requirements, an

20  analysis of whether the Rule 23(b) requirements are met is not necessary. For instance, the predominance

21  requirement of Rule 23(b)(3) is more stringent than the commonality requirement of Rule 23(a)(2), and

22  the analysis under Rule 23(b)(3) "presumes that the existence of common issues of fact or law have been

23  established pursuant to Rule 23(a)(2)." *Hanlon* v. Chrysler Corp., 150 F.3d 1011, at 1019-1022 (9th Cir.

24  1998).  As Plaintiff cannot demonstrate commonality under the more permissive standard of 23(a), he

25  can not do so under the heightened standard of 23(b).

26  /////

27  /////

28  /////

1

**CONCLUSION**

2

For all the foregoing reasons, the Court orders as follows:

3

    1.      Plaintiff's motion for class certification is DENIED.

4

    2.      Plaintiff's motion for facilitation of notice to class members is DENIED.

5

6

IT IS SO ORDERED.

7

**Dated:**   **July 17, 2008**           **/s/ Lawrence J. O'Neill**
                                      UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28